# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JOSHUA J. KELLER, | : | |
| Plaintiff, | : | |
| | | Case No. 3:14cv00362 |
| vs. | : | |
| | | District Judge Thomas M. Rose |
| CAROLYN COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

Plaintiff Joshua J. Keller is a young man who has epilepsy manifested in both grand mal and petite seizures. He also has attention deficit hyperactive disorder, back pain, and other health problems. On August 24, 2011, when Plaintiff was 23 years old, he applied for Supplemental Security Income (SSI). He asserted that he was eligible for SSI because, beginning on August 10, 1998, his health problems precluded him from working a substantial paid job.

Administrative Law Judge Mary J. Withum denied Plaintiff's SSI application based on her main conclusion that he was not under a "disability' within the meaning of the

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

Social Security Act. Plaintiff brings the present case *pro se* challenging ALJ Withum's non-disability decision. The case is before the Court upon Plaintiff's Statement of Specific Issues (Doc. #11), the Commissioner's Memorandum in Opposition (Doc. #s 14, 15 (corrected copy)), the administrative record (Doc. #6), and the record as a whole.

**II.     Background**

Plaintiff was 23 years old on the date he applied for Supplemental Security Income. The ALJ therefore considered him a "younger" person under Social Security regulations. The ALJ found Plaintiff to have at least a high-school education. Other than working as a bagger in a grocery store, Plaintiff has not held a past job.

The ALJ held a hearing in January 2013 during which Plaintiff was represented by an attorney. Plaintiff testified that he had been going to job training that involved computer work. He explained that he attended classes at a TV station where he also assisted people with computer work. He explained, "I happen to be very familiar with general computer technology and programs so when people have problems I could easily help them ...." (Doc. #6, *PageID* #105). This was unpaid volunteer work. He has never held a full-time job. *Id*. at 108.

At the time of the ALJ's hearing, Plaintiff was supported financially by his stepfather. Plaintiff's mother drives him to and from places he needs to go because he does not have a driver's license. His medical conditions have stopped him from trying to get a driver's license. *Id*. at 106.

At the time of the ALJ's hearing in January 2013, he was taking new seizure medications. The ALJ asked him about this as follows:

> Q [ALJ]　　Now since you've taken the new medications it sounds like your seizures are pretty much in control, is that correct?
>
> A [Plaintiff]　Yes.
>
> Q　　How many seizures have you had in the last month?
>
> A　　None, zero.
>
> Q　　How many seizures have you had, and I know – and this isn't a quiz but I just want to get a sense, but how many in the last three months?
>
> A　　Zero.
>
> Q　　How about in the last six months?
>
> A.　　Zero.
>
> Q　　Sounds like the new medication's is helping a lot.
>
> A　　Yes.

(Doc. #6, *PageID* #108-09). Plaintiff further testified that he had experienced "a couple" of grand mal seizure during the past year (2012). *Id*. at 109. He was treated for these at the hospital on an outpatient basis. He explained his medication predicament as follows:

> Well, earlier on I was on a different medication which didn't, I guess, didn't really work that well because even if I wasn't on the medication I still have them [grand mal seizures] once a month. Later on I switched to Keppra and I ended up having more seizures a month. Then we switched over to Zonegran at a lower dosage and it seemed to be working but I still ended up having a seizure. So we increased the dosage and that's when I haven't had a seizure, a grand mal since then.

3

*Id*. Before the time he was taking Zonegran, he generally had 1 grand mal seizure a month. A grand mal seizure would stop after about 5 minutes but, he testified, "I was not able to do anything after that. I would be on the floor. Like if I wasn't taken to the hospital I would be on the floor in the bathroom throwing up. And then in between throwing up I'd just be sleeping." *Id*. at 114.

Plaintiff also experienced petite mal seizures. He continued to have those seizures after starting on Zonegran. Plaintiff's counsel asked him if he was aware when he was having a petite mal seizure. He answered: "Well, I'm more after they happen because they happen so, petit mals happen very quickly. I don't really notice and I'm not aware [of] the petit mals during them but until after they happen." *Id*. at 115. Plaintiff stated that his petit mal seizures usually last less than a second, and he "could have one and just keep going and no one wouldn't, unless they're really paying attention[,] no one would even notice." *Id*. Once he started taking Zonegran, he had experienced petite mal seizures a total of 3 times.

In 2007, Plaintiff starting taking classes at Sinclair Community College in Dayton. Over the years, he had limited academic success. In 2013, he had not yet earned an Associate's degree. He testified that this was due to his attention deficit hyperactivity disorder (ADHD), which usually made it difficult for him to focus and it usually took him "longer to work things out ...." *Id*. at 118. He had never been able to take a full load of classes because he "couldn't keep up with work from all those classes at the same time." He failed about 7 classes in part due to his ADHD-related problems with focusing or

concentrating. He took medication for ADHD. But, he stated, "there's a problem with increasing your ADHD medication. The side affect of ADHD medication increases the seizure threshold. So keeping it at a low dosage makes it less likely for me to have a seizure ...." *Id*. at 119. Plaintiff further testified, "Well, my Atretol [Adderall]² and my Zonegran they kind of conflict with each other so my Zonegran makes me tired, and my Atretol, for my ADHD, that makes me, well, it makes me more alert. Then it makes me also a little bit more tired." *Id*. at 110 (footnote added). Plaintiff testified that the Atretol controlled his ADHD. *Id*. at 110-11.

A detailed description of the remaining evidence is unnecessary because the undersigned has reviewed the entire administrative record and because both the Commissioner and the ALJ have discussed the relevant records concerning Plaintiff's physical and mental impairments with citations to specific evidence. Plaintiff, moreover, briefly refers to certain medical evidence in his Statement of Errors. (Doc. #11, *PageId* #724).

### III. "Disability" Defined and ALJ Withum's Decision

The Social Security Administration provides Supplemental Security Income to indigent individuals, subject to several eligibility requirements. Chief among these is the "disability" requirement. To receive Supplemental Security Income an applicant must be a

---

² The Commissioner accurately explains, "There is some confusion in the transcript between 'Atretol,' a seizure medication, and 'Adderall' a medication used for ADHD (PageID 110-111). From the context of the questioning about ADHD, it appears that most of the references to 'Atretol' actually refer to 'Adderall.'" (Doc. #15, *PageID* #757, n.7).

5

"disabled individual." 42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who have a medically determinable physical or mental impairment that is severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70.

As noted previously, it fell to ALJ Withum to evaluate the evidence connected to Plaintiff's application for Supplemental Security Income. She did so by considering each of the 5 sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 416.920(a)(4). She reached the following main conclusions:

Step 1: Plaintiff had not engaged in substantial gainful employment since the date he applied for SSI (August 24, 2011).

Step 2: Plaintiff has the severe impairment of epilepsy. His other health problems did not constitute 1 or more severe impairments.

Step 3: Plaintiff does not have an impairment or combination that meets or equals the severity of one in the Commissioner's Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Plaintiff's residual functional capacity, or the most he could do in a work setting despite his impairments, *see Howard v. Comm of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consisted the ability to perform the full range of exertional work, but he has "nonexertional limitations including ... [he] can never climb ladders, ropes, or scaffolds, must avoid concentrated use of dangerous moving machinery, and all exposure to unprotected heights. [His] work in limited to simple, routine, and repetitive tasks. [He] must be employed in a low stress job with only occasional decisionmaking required and only occasional changes in work setting." (Doc. #6, *PageID* #87).

      Step 4:      Plaintiff did not have any past relevant work.

      Step 5:      He could perform a significant number of jobs that exist in the national economy, such as laundry worker, kitchen helper, and dining room attendant.

(Doc. #6, *PageID* #s 85-93). In the end, the ALJ's finding at Step 5 led to her ultimate conclusion that Plaintiff was not under a benefits-qualifying disability.

## IV. Judicial Review

The Social Security Administration's denial of Plaintiff's applications for benefits – here, embodied in ALJ Withum's decision – is subject to judicial review along two lines: whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings. *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"

*Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

V. **Discussion**

Plaintiff's Statement of Errors discusses and raises argument about certain sections of the Commissioner's Listings. He begins by seeming to acknowledge that his grand mal seizures do not meet the duration requirement for showing that his epilepsy meets or equals the criteria for §11.02 of the Commissioner's Listing of Impairments. (Doc. #11, *PageID #* 721). Plaintiff, however, points out that he has at least 1 petite mal seizure per day, and he argues that his epilepsy consequently meets the duration requirement of Listing §11.03.

In the event Plaintiff does challenge the ALJ's findings related to his grand mal seizures and Listing §11.02, no error appears at Step 3 of the ALJ's decision. Listing §11.02 requires that a claimant's grand mal seizures occur "more frequently than once a month in spite of at least 3 months treatment ...." Plaintiff testified during the ALJ's hearing that he had experienced "a couple" of grand mal seizure during the past year (2012). *Id*. at 109. He essentially testified that once he began taking Zonegran in September 2010, his seizures did not occur more frequently than once a month and were far fewer in number and frequency. *See id*. at 109, 114-16. It reasonably follows from this that by September 2011, when he first became potentially eligible for SSI, the frequency of his grand mal seizures was still well below the seizure frequency mandated by Listing §11.02.

*See* §11.00(A) ("Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment...." ).  Medical records, moreover, suggest that Plaintiff experienced  about 1 grand mal seizure about every 6 months after starting Zonegran.  *See* Doc. #6, *PageID* #s 392, 394, 459, 462, 465.  Substantial evidence therefore supported the ALJ's conclusion that Plaintiff did not meet the criteria of Listing §11.02.

Turning to Plaintiff's petite mal seizures, Listing §11.03 requires such seizures to occur "more frequently than once weekly in spite of at least 3 months of prescribed treatment."  Although the ALJ should have separately addressed Listing §11.03, the findings that the ALJ relied on in Listing §11.02 were equally applicable with to a Listing §11.03 analysis.  Plaintiff's testimony likewise supports the conclusion that the frequency of his petit mal seizures was not more often than once a week as required by Listing §11.03. (Doc. 6, *PageID* #s 115-16.  Additionally, Plaintiff reported to psychologist Dr. Arnold that medication had been effective in controlling his seizures, and "[h]e indicated that the has experienced only one seizure since starting this medication [Zonegran], which occurred in December 2010." *Id*. at 379.  Assuming, as Plaintiff now states, that he has daily petite mal seizures, this does not assist him in showing that at or near the time frame at issue in ALJ Withum's decision, he was having daily petite mal seizures.  At best for his potential social-security eligibility, his now-daily petite mal seizures may touch upon matters pertinent to a future SSI application.

Plaintiff also relies on the criteria of Listing §12.04(A)-(C) for affective disorders and contends, "Because I have ADHD, I should qualify for this."[3] (Doc. #11, *PageID* #s 721-22). Later in his Statement of Errors, he sets out Listing §12.06 for anxiety-related disorders, *id*. at 723, and he raises additional points about the evidence related to his ADHD and anxiety. *Id*. at 724.

The ALJ found that Plaintiff's ADHD and mental impairments did not constitute severe impairments. (Doc. #6, *PageID* #s 86-87). By definition, a non-severe impairment does not cause more than minimal mental-functional limitations. *See* 20 C.F.R. § 416.921(a). As long as ALJ Withum applied the correct criteria at Step 2 of the sequential evaluation and as long as substantial evidence supported her conclusion that Plaintiff's ADHD and mental impairments did not constitute severe impairments at Step 2, it follows that his non-severe mental impairments could not meet or equal the more demanding standards that apply at Step 3. *See* 20 C.F.R. §416.925(a) (The Listings "describe[,] for each of the major body systems[,] impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."). This more demanding standard is readily seen in the presumption of disability that will apply when an applicant meets or equals the criteria of 1 or more Listing at Step 3:

---

[3] The Commissioner notes, "State Agency doctors typically apply Listing 12.02 (organic mental disorders) for ADHD. *E.g*., Kelly v. Comm'r of Soc. Sec., No. 2:10cv00775, 2011 WL 4484149 at *7 (S.D. Ohio Aug. 4, 2011)(M.J. Deavers) (adopted in 2011 WL 4482489 (S.D. Ohio Sept. 27, 2011) (J. Marbley))." (Doc. #15, *PageID* #762, n.8).

> The Secretary [now, the Commissioner] has set the medical criteria defining the listed impairments at a higher level than the statutory standard. The listings define impairments that would prevent an adult regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'... The reason for this difference between the listings' level of severity and the statutory standard is that ... the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

*Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (internal citations omitted). Given the demanding standard applicable at Step 3, ALJ Withum's omission of Plaintiff's ADHD and anxiety at Step 3 was problematic if legal error occurred or substantial evidence was lacking at Step 2 of her sequential evaluation.

ALJ Withum applied the correct legal criteria at Step 2 to determine if Plaintiff's ADHD and mental impairments met the definition of a severe impairment. *See* Doc. #6, *PageID* #s 86-87. She did so by assessing the effect Plaintiff's ADHD and mental impairments had upon Plaintiff's mental-work abilities in the 4 functional areas required by the Regulations, 20 C.F.R. §§ 416.920(a)(3)-(4). The ALJ found no limitation in Plaintiff's activities of daily living and social functioning, only a mild limitation in maintaining concentration, persistence or pace, and no episodes of decompensation of extended duration. (Doc. #6, *PageID* at 86). The ALJ concluded, "Because [Plaintiff's] medically determinable impairment causes no more than 'mild' limitation in any of the first three functional areas on 'no' episodes of decompensation which have been of extended duration in the fourth areas,

11

it is non severe." *Id*. at 87.

The ALJ findings in the 4 functional areas of Plaintiff's mental-work abilities were consistent with the medical opinions of consultative psychologist Dr. Firmin, and state-agency psychologists, Drs. Zwissler and Dr. Steiger. *Id*. at 86, 91, 131-32, 144-45, 337-38. Each of these opinions stated that Plaintiff did not have any severe mental impairment and had no more than a mild limitation in any of the four functional areas.[4] These medical source opinions constitute substantial evidence in support of the ALJ's conclusion that Plaintiff's ADHD and mental impairments did not constitute severe impairments at Step 2 of her sequential evaluation.

Substantial evidence also supports the ALJ's conclusions, at Step 2, about Plaintiff's mental functioning, beginning with her finding that Plaintiff had no limitation in his daily activities. *Id*. at 86. The ALJ cited Plaintiff's statements in his function report from September 2011 that he prepared simple meals, did the laundry, vacuumed, mowed the lawn, took out the garbage, cleaned and took care of pets *Id*. at 86, 254-60. He had hobbies including watching television, animation and playing videogames. *Id*. He performed these activities of daily living without assistance. *Id*. at 86, 336. Such substantial evidence supports the ALJ's conclusion that Plaintiff's daily activities were not limited by his mental impairments. Plaintiff, moreover, does not discuss any activities of daily living that he cannot perform on appeal, or cite to evidence contrary to the ALJ's finding of no limitation

---

[4] Dr. Zwissler and Dr. Steiger also opined that Plaintiff did not meet or medically equal any of the mental-disorder Listings. *Id*. at 131-32, 144-45.

in this area.

In discussing Plaintiff's lack of a limitation in social functioning, the ALJ referred to Plaintiff's function report in which he indicated that he played videogames with others. *Id*. at 86, 257. He went to parties, attended daily classes, went out to "B dubs" (apparently, Buffalo Wild Wings[5]), and to see movies *Id*. at 86, 257. He denied any problems getting along with family, friends, neighbors or others. *Id*. at 258. Substantial evidence thus supported the ALJ's conclusion that Plaintiff had no limitation in his social functioning.

Substantial evidence also support the ALJ's finding that Plaintiff had a mild limitation in maintaining concentration, persistence or pace is supported by examination findings. During psychological testing, Plaintiff could follow simple directions, had average working memory, processing speed and intellectual functioning. *Id*. at 83, 381. Dr. Firmin's consultative examination showed only mild deficits in concentration, persistence or pace through word recall, digit span, and other tests. *Id*. at 86, 335, 338.

Lastly, as to Plaintiff's mental-work functioning substantial evidence supports the ALJ's finding at Step 2 that he had no episodes of decompensation. Plaintiff does not allege any hospitalizations or other periods of increased symptoms, let alone those lasting for an extended duration.

Plaintiff contends that the ALJ should not have relied on a statement by neurologist Dr. White concerning Plaintiff's possible lack of need for Adderall to treat his ADHD. Dr.

---

[5] *See* Doc. #15, *PageID* #763.

White indicated in November 2012, "He continues to take Adderall for attention deficit disorder though it is not entirely clear that he needs this medication...." *Id*. at 724.  Yet, it does not assist Plaintiff even to assume that the ALJ should not have relied on Dr. White's comment.  This is so because the ALJ relied on other substantial evidence, reviewed above, to support her Step-2 assessment of Plaintiff's limitations in his mental-work abilities in the 4 functional areas.

Plaintiff also sets out the criteria under Listing §1.04 for disorders of the spine.  He points out the he presented documentation that explains his spinal condition and that because he has epilepsy, he is prone to back spasms, scoliosis, vertebral subluxations, and other spinal injuries.  And, Plaintiff relies on evidence from his chiropractor concerning his back condition after he has a seizure.

The ALJ determined at Step 2 that Plaintiff did not have a severe spinal impairment.  The ALJ then did not consider whether Plaintiff's spinal impairments met or equaled Listing §1.04 at Step 3 of her sequential evaluation.  For the reasons stated above at to Plaintiff's mental impairments, the ALJ's omission of Plaintiff's spinal impairments at Step 3 was proper if she did not commit legal error at Step 2 and substantial evidence supports the finding of non-severe spinal problems.  The ALJ applied that correct legal criteria when evaluating Plaintiff's spinal problems, finding he has only minimal spinal abnormality that "will not more than minimally impact [Plaintiff's] ability to work ...." (Doc. #6, *PageID* #86).  The ALJ relied on substantial evidence to support these conclusions.  Such evidence

included a September 2011 X-ray report which consulting examiner Dr. Danopulos noted was "normal except slight retrolisthesis." *Id*. at 421, 427. The results of Dr. Danopulos' examination further showed normal range of motion throughout Plaintiff's spine, shoulder, knees, hips, and ankles. *Id*. at 424-26. Bilateral leg raising was straight, squatting and rising from squatting were normal, and he got on and off the examining table without difficulty. *Id*. at 421. "Muscoloskeletal examination revealed a normal gait without ambulatory aids. Spine painless to pressure." *Id*. Dr. Danopulos further reported, "There was no evidence of nerve root compression or peripheral neuropathy." *Id*. In light of such findings, the documentation Plaintiff relies on or other spinal evidence in the record, does not eliminate the presence of this substantial evidence supporting the ALJ's step-2 decision. "Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *Her*, 203 F.3d at 389-90.

Turning to the ALJ's decision at Step 4 of the sequential evaluation, the Commissioner correctly points out that she addressed Plaintiff's work limitations due to her medically determinable impairments, both severe and non-severe. This seen in the ALJ's inclusion of physical and mental restrictions in her assessment of Plaintiff's residual functional capacity (RFC) (or, the most he could do in a work setting despite his impairments, *see Howard*, 276 F.3d at 239).

The ALJ's RFC eliminated climbing ladders, ropes or scaffolds, concentrated use of

dangerous moving machinery, and all exposure to unprotected heights.  (Doc. #6, *PageID #* 87).  These restrictions adequately accommodated Plaintiff's seizures and non-severe back impairments with reports of pain and safety concerns.  These postural and environmental restrictions were also recommended by the state agency reviewing physicians, Drs. Golestany and Long, *id*. at 90, 13-135, 14-148, and it was not error for her to do so.  *See* Soc. Sec. R. 96-6p, 1996 WL 374180, *2 ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are expert in the evaluation of the medical issues in disability claims under the [Social Security] Act....").

      As discussed above, Plaintiff's seizures became infrequent after September 2010 after he began taking Zonegran, and accordingly, the ALJ declined to impose any exertional restrictions (sitting, standing, walking, pushing, pulling, lifting and carrying).  *Id*. at 87. Based on the evidence reviewed previously, a reasonable person could concluded that Plaintiff did not have exertional limitations.  This included the results of the examination performed by Dr. Danopulos, reviewed above.  *See id*. at 418-27.  In May 2012, Plaintiff reported, "Excellent general overall feeling" and a 0 on the 0 to 10 pain-severity scale. *Id*. at 448.  Plaintiff asserts that he presented documentation showing his back impairments, but he does not cite any specific pages or medical findings.  (Doc. #11, *PageID* #724).  He last saw a chiropractor in 2009, about 2 years before filing for disability.  He stated that he is "prone to back spasms, scoliosis, vertebral subluxations, and other spinal injuries" because of his epilepsy.  *Id*.  His response to chiropractic care was reported to be "favorable, according to

16

all objective testing and feedback from subjective sources." (Doc. #6, *PageID* #440). Additionally, because the number and frequency of his seizures were controlled, the available evidence also indicated that his back pain was controlled after the date he applied for benefits.

As to his mental RFC, the ALJ restricted Plaintiff to simple, routine and repetitive tasks in a low-stress job with only occasional decisionmaking required and only occasional changes in the work setting. *Id*. at 87. This was a restrictive RFC given Plaintiff's no more than mild deficits in maintaining concentration, persistence or pace. Plaintiff's ADHD and mental impairments did not require further restrictions in his mental RFC. For example, testing in February 2011 indicated that Plaintiff could follow simple directions, had average working memory, processing speed and intellectual functioning. *Id*. at 381. Dr. Firmin's consultative psychological examination revealed only mild deficits in concentration, persistence or pace as shown in word recall, digit span and other tests. *Id*. at 335, 338. As recently as January 16, 2013, the day after Plaintiff's administrative hearing, he reported that his mental health symptoms had improved, and Dr. Gollamudi, his psychiatrist, indicated that his depression, mood symptoms and anxiety were okay, with no discussed concentration deficits. *Id*. at 609. Dr. Gollamudi's other treatment records throughout 2012 typically found Plaintiff stable or improving. *Id*. at 610-17.

Plaintiff asserts that he still has a low-attention span and is unable to take in any information. He testified his ADHD medication affects his seizure threshold. *Id*. at 119.

17

This latter point is correct, but in any event, Plaintiff has not had many seizures and reported that his ADHD was controlled on his current medication regimen. *Id*. at 109-10, 114-16. Plaintiff cites severe attention problems, such as being unable to complete even a quarter of Dr. Eicher's testing, when taken off of medication. (Doc. #11, *PageID* #724). Yet, Dr. Eicher's testing is not in the certified administrative record. It appears that Plaintiff saw Dr. Eicher between 2006 and 2008, several years before his SSI application. This time frame is too removed from the period at issue in this appeal. (Doc. #6, *PageID* #s 517-43, 554-66, 673). *See Siterlet v. Sec'y of HHS*, 823 F.2d 918, 920 (6th Cir. 1987) (report was "minimally probative" where doctor saw claimant 8 months after expiration of insured status).

      Plaintiff alleges that HIRE testing show an intellectual disability when off medication but a genius level intelligence when on medication. *Id*. However, a review of the HIRE testing shows at worst "average" intellectual performance when off medication, nowhere near intellectual disability. (Doc. #6, *PageID* #s 381-82). Based on the testing, Dr. Arnold believed that Plaintiff could perform simple, repetitive work, and without "attentional medication," he would be limited to "a repetitive manual type position ...." *Id*. at 386. Plaintiff's present assertion that he has a low-attention span, low energy, and difficulty taking in information after a short time conflicts with his own hearing testimony. *See id*. at 110-11. Plaintiff does not identify evidence in the administrative record that would result in a changed RFC or that support finding his back impairments, depression, ADHD, or anxiety meet or medically equal a listing.

18

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE RECOMMENDED THAT:

1. The ALJ's decision that Plaintiff had not been under a benefits-qualifying disability since August 24, 2011, the date he applied for SSI, be affirmed; and

2. The case be terminated on the Court's docket.


January 11, 2016

                s/Sharon L. Ovington
                Sharon L. Ovington
             Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).